## UNITED STATES *v.* McLAUGHLIN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 1027. Argued December 8, 9, 12, 1887. — Decided May 14, 1888.

The boundaries of the Mexican grant, called the Moquelamos grant, considered, — the same being described as "bounded on the east by the adjacent sierra:" *held*, as the result of the evidence adduced, that its eastern limit was at the point where the foot hills of the sierra begin to rise above the plain, near the range line between ranges 7 and 8.

Mexican grants were of three kinds; 1, grants by specific boundaries, where the donee is entitled to the entire tract; 2, grants of quantity within a larger tract described by outside boundaries, where the donee is entitled to the quantity specified and no more; 3, grants of a certain place or rancho by name, where the donee is entitled to the whole place or rancho. The second kind, grants of quantity in a larger tract, are, properly, floats, and do not attach to any specific land until located by authority of the government. The Moquelamos grant was of this kind.

In the case of floating grants, as above described, it was only the quantity actually granted which was reserved during the examination of the validity of the grant; the remainder was at the disposal of the government as part of the public domain. If within the boundaries of a landgrant made in aid of a railroad, such land-grant would take effect, except as to the quantity of land, or float, actually granted in the Mexican grant. If that quantity lying together was left to satisfy the grant, the railroad company would be entitled to patents for the odd sections of the remainder.

In the case of a floating Mexican grant the government retained the right of locating the quantity granted in such part of the larger tract described as it saw fit; and the government of the United States succeeded to the same right: hence, the government might dispose of any specific tracts within the exterior limits of the grant, leaving a sufficient quantity to satisfy the float.

Patents issued to the Central Pacific Railroad Company under its land-grant, for any sections lying easterly of range 6 east within the outside boundaries of the Moquelamos grant, are valid, — there being enough land lying west of range 7 to satisfy the floating grant of eleven square leagues.

The bill in this case was filed by the Attorney General on behalf of the United States to vacate a patent granted to the Central Pacific Railroad Company for lands lying east of range 6 within the claimed limits of the Moquelamos grant — the ground of relief being, that all the lands within the exterior limits of that grant were reserved lands: *held*, that the lands in question were not reserved lands, and that the bill should be dismissed.

BILL IN EQUITY to cancel a patent of public land issued to the Central Pacific Railroad Company of California. Decree dismissing the bill. Complainant appealed. The case is stated in the opinion.

*Mr. Michael Mullany*, with whom was *Mr. Attorney General* and *Mr. D. M. Delmas* on the brief, for appellant cited: *United States* v. *Fossat*, 1 Hoffman, 211, 376; *S. C.* 20 How. 413; 21 How. 445; *Schulenberg* v. *Harriman*, 21 Wall. 44; *Missouri &c. Railway Co.* v. *Kansas Pacific Railway*, 97 U. S. 491; *Van Wyck* v. *Knevals*, 106 U. S. 360; *Wright* v. *Rosberry*, 121 U. S. 488; *Railroad Co.* v. *Baldwin*, 103 U. S. 426; *Leavenworth &c. Railroad Co.* v. *United States*, 92 U. S. 743; *Newhall* v. *Sanger*, 92 U. S. 761; *United States* v. *Stone*, 2 Wall. 525; *Dubuque and Pacific Railroad Co.* v. *Litchfield*, 23 How. 66; *Railroad Co.* v. *Fremont County*, 9 Wall. 89; *Reichart* v. *Felps*, 6 Wall. 160; *Best* v. *Polk*, 18 Wall. 112; *Sherman* v. *Buick*, 93 U. S. 209; *Stoddard* v. *Chambers*, 2 How. 284; *Patterson* v. *Winn*, 11 Wheat. 380; *Barry* v. *Gamble*, 3 How. 32; *Mills* v. *Stoddard*, 8 How. 345; *Walden* v. *Knevals*, 114 U. S. 373; *Kansas Pacific Railway Co.* v. *Dunmeyer*, 113 U. S. 629; *Knevals* v. *Hyde*, 5

Dillon, 469; *Grinnell* v. *Railroad Company*, 103 U. S. 739; *United States* v. *Burlington & Missouri Railroad Co.*, 4 Dillon, 297, 305; *Morris and Essex Railroad Co.* v. *Blair*, 9 N. J. Eq. 653; *Carr* v. *Quigley*, 57 Cal. 394; *McLaughlin* v. *Powell*, 50 Cal. 64, 67.

*Mr. A. L. Rhoads* and *Mr. L. W. Elliott* for appellees cited: *Newhall* v. *Sanger*, 92 U. S. 761; *Pico* v. *United States*, 2 Wall. 279; *United States* v. *Minor*, 114 U. S. 233; *United States* v. *White*, 9 Sawyer, 131; *The Siren*, 7 Wall. 152; *United States* v. *Flint*, 4 Sawyer, 42, 58; *Badger* v. *Badger*, 2 Wall. 87; *Stearns* v. *Page*, 7 How. 819; *Sullivan* v. *Portland &c. Railroad*, 94 U. S. 806; *Twin Lick Co.* v. *Marbury*, 91 U. S. 587; *United States* v. *Tichenor*, 8 Sawyer, 142; *Manning* v. *San Jacinto Tin Co.*, 7 Sawyer, 418; *Moffat* v. *United States*, 112 U. S. 24; *United States* v. *Central Pacific Railroad Co.*, 8 Sawyer, 81; *Walden* v. *Knevals*, 114 U. S. 373; *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629; *Van Wyck* v. *Knevals*, 106 U. S. 360; *Wood* v. *Railroad Co.*, 104 U. S. 329; *Railroad Co.* v. *Baldwin*, 103 U. S. 426; *Barney* v. *Winona Railroad*, 117 U. S. 228; *United States* v. *Phelan*, 4 Sawyer, 58; *Pratt* v. *Cal. M. Co.*, 9 Sawyer, 354, 363; *Johnson* v. *Towsley*, 13 Wall. 72; *Maxwell Land Grant Case*, 121 U. S. 325; *Steel* v. *Smelting Co.*, 106 U. S. 447; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Ehrhardt* v. *Hogaboom*, 115 U. S. 67.

Mr. Justice Bradley delivered the opinion of the court.

This is a bill in equity filed by the Attorney General on behalf of the United States against The Central Pacific Railroad Company, Kate D. McLaughlin, as executrix of Charles McLaughlin, deceased, and others, to cancel and annul a certain patent of the United States, issued on the 23d day of November, 1875, to the Central Pacific Railroad Company from the General Land Office, for certain sections and fractional sections of land in San Joaquin and Calaveras counties in California. The ground of relief stated in the bill is, that

the patent was issued without authority of law, for the reason that all of said lands were within the boundaries of a certain Mexican grant claim, called the Moquelamos grant, and were held and reserved for adjustment and satisfaction of said claim at the time when the line of railroad belonging to said company was definitely fixed, and when, by virtue of that fact, the government grant on which the patent was based accrued. The patent was granted to the railroad company for the lands in question as portions of its land·grant under the Pacific Railroad acts passed by Congress in 1862 and 1864. This grant was originally made to the Central Pacific Railroad Company of California; was assigned, at the place in question, by said company, to the Western Pacific Railroad Company 'on the 31st day of October, 1864, which assignment was approved by act of Congress of March 3d, 1865; and the two companies named were consolidated together and constituted the present Central Pacific Railroad Company in August, 1870, upon which last company devolved all the franchises, rights, privileges, and property of the said two first named companies.

The bill sets forth the alleged Mexican grant, called the Moquelamos grant, and the proceedings in relation thereto upon the claim made for its confirmation, before the Commissioners to ascertain and settle private land claims in California, and the District and Supreme Courts of the United States, resulting in the final rejection of said claim by the adjudication of the Supreme Court on the 13th of February, 1865. The bill also states that the lands included within the boundaries of said claim were held and reserved during said proceedings, to await final·adjudication, until said last mentioned date; that said lands lie in the counties of San Joaquin and·Calaveras, on each side of the road of the said railroad company between the cities of Sacramento and San José. It recites those parts of the acts of Congress passed in 1862 and 1864, which granted to the Central Pacific Railroad Company of California the right to construct a railroad and telegraph line from the Pacific Coast, at or·near San Francisco, to the eastern boundary of the State; and states the fact that under and

by virtue of said acts there were granted, for the purpose of aiding in the construction of said road and telegraph line, ten alternate sections of the public lands on each side of and within twenty miles of the road, designated by odd numbers, not sold, reserved or otherwise disposed of by the United States, and to which a homestead or preëmption claim might not have attached at the time the line of the road of said company should be definitely fixed.

The bill then alleges that on the 5th day of October, 1864, the line of said road from the city of Sacramento to its western terminus at the city of San Francisco, including that portion opposite to the Moquelamos grant, was definitely fixed, and a map of said definite location of said road was filed by the said Central Pacific Railroad Company of California with the Secretary of the Interior on the 8th of December, 1864; and that on the 31st of January, 1865, the Secretary of the Interior ordered all of the public lands not then sold, reserved or otherwise disposed of within the limits of twenty-five miles on each side of said road to be withdrawn from preëmption, private entry and sale.

The bill then states the assignment on the 31st of October, 1864, by the Central Pacific Railroad Company of California to the Western Pacific Railroad Company of the right to construct the road from Sacramento to San José, with all privileges and benefits, etc., and the confirmation of said assignment by act of Congress, approved March 3d, 1865. It further states that notwithstanding the lands within the boundaries of the Moquelamos grant claim were held and reserved for the satisfaction of said claim from the acquisition of California until the final rejection of the claim on the 13th day of February, 1865, embracing the time when the line of said road was definitely fixed, yet the said patent was issued as aforesaid to the said Central Pacific Railroad Company, as the successor in interest of the Western Pacific Railroad Company, for the lands in question, which it is alleged were embraced within the boundaries of said Moquelamos grant claim.

The defendants, in their answer, deny that the line of the railroad from Sacramento to its western terminus was defi-

nitely fixed in October, 1864, or at any time prior to 1868; or that a map of the definite location of the said line or of the portions thereof opposite the Moquelamos grant was filed with the Secretary of the Interior, or in the General Land Office, in December, 1864, or at any time prior to the first of February, 1870. They admit that on the 5th of October, 1864, the Central Pacific Railroad of California designated the general route of its said road between San Francisco and Sacramento; and on the 8th of December, 1864, filed a map of the general route of its said railroad in the Department of the Interior. They admit that the lands in question are within twenty miles of the railroad as definitely located and fixed.

They allege that the Western Pacific Railroad Company, in the year 1868, definitely and finally located and fixed that portion or section of the line and route of said railroad and telegraph extending from a point at or near the city of Stockton to a point at or near Sacramento, and, on the first of February, 1870, filed in the Department of the Interior a map of said portion or section of said line; and that after the consolidation and the formation of the present Central Pacific Railroad Company, to wit, on the 27th day of February, 1873, the said company filed in the Department of the Interior a map of the line and route of said railroad as definitely and finally located and fixed from the end of the first twenty-mile section from San José to a point at the end of the $133\frac{16}{100}$ miles from San José, at or near Sacramento; and that said line and route so definitely and finally located and fixed are opposite to the lands in question, and include the line or section definitely located by the Western Pacific, and shown on the map filed in February, 1870.

The defendants further allege that the lands in question were public lands, and were not reserved, or disposed of in any manner, at the time of the passage of the acts of July 1st, 1862, and July 2d, 1864, respectively, and at the time of filing the general route of the railroad in December, 1864, and of the withdrawal of the lands by the Secretary of the Interior in January, 1865, and of the definite and final location in 1868, and of filing the map of the road in February, 1870,

and the map in February, 1873. They deny that said lands were included in any Mexican grant, or that they were reserved or held under the laws of the United States for the satisfaction of any claim under such grant; and they aver that said lands, during all the times mentioned in the bill, up to and until the issuing of the patent, were public lands of the United States; that said patent was issued to said railroad company under and in accordance with the provisions of said Pacific Railroad acts, and was and is legal and valid; that on the 12th of January, 1876, the Central Pacific Railroad Company conveyed to Charles McLaughlin, in fee simple, the lands in question, for which he paid a full and adequate consideration. The defendants append schedules to their answer showing the particular parcels for which they severally defend. To this answer several exceptions were taken, and being overruled, the general replication was filed. Thereupon the parties joined in a written admission of certain facts agreed to be true, which, omitting those relating to the status of the parties and the organization of the corporations mentioned in the pleadings, is as follows, to wit:

"8. That on, to wit, the 22d day of September, A.D. 1852, one Andres Pico, since deceased, presented and filed his petition to and with the Board of Land Commissioners appointed under the provisions of the act of Congress approved March 3d, 1851, entitled 'An act to ascertain and settle private land claims in the State of California,' in which petition he claimed in fee, as a grant by the Mexican Government, a certain tract of land situated in the said State and district of California, and known by the name of 'Moquelamos,' for eleven square leagues of land, which he alleged in his petition was granted to him within the boundaries as described in the grant made June 6th, A.D. 1846, by Pio Pico, the then Mexican governor of California, by virtue of the authority in him vested; and said petition closed with a prayer to allow and confirm to him, the petitioner, Andres Pico, the said tract of land, as described in the grant made by the aforesaid governor, Pio Pico, with the boundaries as therein set forth, to wit: once sitios de ganado mayor en el rio de Moquelumnes que linda al

norte con la orilla sur de dicho rio; al oriente con la sierra inmediata al sur con el terreno del Señor Gulnak; y al poniente con los esteros de la plaza; and the translation thereof presented to said board with said petition is as follows, to wit: ' Eleven square leagues on the river Moquelamos, bordering on the north upon the southern shore of said river; on the east upon the adjacent ridge of mountains; on the south upon the lands of Mr. Gulnak; and on the west upon the estuaries of the shore.' That said petition was in the usual form of petitions to the Board of Land Commissioners, for the confirmation of claims to land in California, founded upon grants made by the Mexican Government.'

"9. That said Board of Land Commissioners proceeded to consider and determine the said petition and claim of the said Andres Pico, and on the 3d day of October, 1854, rendered a decree denying the application of said petitioner for a confirmation of his said grant of land, and rejecting his claim therefor.

"10. That afterwards, to wit, on the 11th day of June, 1855, the said claimant and petitioner, Andres Pico, appealed to and petitioned the United States District Court for the Northern District of California for a reversal of the proceedings and decision of the said Board of Land Commissioners, and prayed that the decree of rejection by said board be reversed, and that the petitioner's claim to the said tract of land above described be declared valid, and that a decree be entered confirming the same to the petitioner, Andres Pico, in accordance with said alleged grant to him by the Mexican Government, as aforesaid; and the said District Court thereupon proceeded to hear, consider, and review the said decision and decree of said Board of Land Commissioners and the petition of said Andres Pico, and at a stated term of said court, held on the 24th day of April, 1857, made and entered a decree reversing the decree of rejection of said claim by the said Board of Land Commissioners, and adjudged and decreed that the claim of petitioner was valid, and confirmed the Moquelamos grant above described to the petitioner, Andres Pico, and defined the boundaries thereof as follows:

' "The land of which confirmation is hereby made is of the extent of eleven square leagues, and no more, and is known by the name of 'Moquelamos,' and is situate on the river Moquelamos, bordering upon the north upon the southern shore of said river; on the east on the adjacent ridge of said mountains; on the south on the land of Mr. Gulnak, and upon the west upon the estuaries of the shore, as described in the original decree and grant of the same by the governor of California on the 6th day of June, 1846, a copy of which is on file in the transcript in this case."

"11. That thereafter the United States appealed from said decree of confirmation to the Supreme Court of the United States, and at the December term, 1859, of said court the aforesaid decree of confirmation of said District Court was, by the Supreme Court of the United States, reversed, and the case remanded, with directions to have further evidence taken in the cause and claim of said Andres Pico, for said Mexican grant Moquelamos. That thereafter the said District Court proceeded to take further evidence in said case, and after such further evidence was taken, the case was again brought before said District Court for hearing, and by that court a decree was entered on the 4th day of June, 1862, adjudging the claim of the petitioner to be invalid, and rejecting the same.

"12. That thereafter, on, to wit, the 15th day of October, 1862, the petitioner, Andres Pico, appealed to the Supreme Court of the United States from said decree of said District Court rejecting his claim as invalid. That a final hearing of said cause was had before said Supreme Court, and on the 13th day of February, A.D. 1865, a judgment was made and entered by said United States Supreme Court affirming said decree of the United States District Court, rejecting the claim of said Pico, and adjudging the same to be invalid.

"13. That all of the lands included within the boundaries of said alleged Moquelamos grant above described lie in said State and lie on each side of the road of said The Western Pacific Railroad Company, and opposite thereto in its course from said city of Sacramento to said city of San José.

"14. That under and by virtue of the act of Congress,

approved July 1, 1862, entitled, 'An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes,' and the act amendatory thereof, approved July 2d, 1864, commonly known as the Pacific Railroad acts, The Central Pacific Railroad Company of California was authorized to construct a railroad and telegraph line from the Pacific Coast, at or near San Francisco, to the eastern boundary of said State of California, and under and by virtue of said acts of Congress there were granted for the purpose of aiding in the construction of the road and telegraph line of said The Central Pacific Railroad Company of California ten alternate sections of the public lands of the United States, on each side and within twenty miles of the road of said company, designated by odd numbers, not sold, reserved, or otherwise disposed of by the United States, and to which a homestead or preëmption claim might not have attached at the time the line of the road of said company should be definitely fixed.

"15. That the said railroad company filed its assent to said Central Pacific Railroad acts at the time and in the manner in said acts provided.

"16. That on, to wit, the 23d day of December, 1864, the Secretary of the Interior of the United States ordered all of the public lands not then sold, reserved or otherwise disposed of, within the limits of twenty-five miles on each side of the route or line of the road of said railroad company, to be withdrawn from preëmption, private entry, and sale in accordance with the provisions of said acts of Congress, for said railroad company; and said order was thereupon transmitted to the register and receiver of the United States land offices at Stockton, San Francisco, and Sacramento, State of California, and received by them on the 31st day of January, 1865.

"17. On the 29th day of September, 1866, the president of the Western Pacific Railroad Company made and filed with the United States Surveyor General of the State of California the varied statement provided for by § 4 of said act of July 1, 1862, and § 6 of said act of July 2, 1864, showing the con-

struction, completion, and equipment by said Western Pacific Railroad Company of the most westerly twenty miles, viz., the twenty miles next northeasterly from the city of San José, of the railroad and telegraph line of said Western Pacific Railroad Company, in compliance with and conformity to the requirements and provisions of said sections of said acts of Congress; and said Surveyor General thereupon, at the request of said railroad company, notified the commissioners designated and provided for by said acts to examine said twenty miles of said road and telegraph line and report thereon, in accordance with the provisions of said acts of Congress; and on the 5th day of October, 1866, said commissioners made their report and certificate to the effect that said twenty miles of road and telegraph line mentioned in said verified statement had been constructed, completed, and equipped by said railroad company, as provided and prescribed in and by said acts of Congress.

"Similar verified statements were made by the president of said Western Pacific Railroad Company as follows: On April 28, 1869, for a section of the road beginning at the junction thereof with the road of the Central Pacific Railroad Company of California, at the American River Bridge near Sacramento City, and extending thence southwesterly twenty (20) miles; also, on October 12, 1869, for a section of said road beginning at the westerly end of the last mentioned section, and extending thence southwesterly sixty-three (63) miles; also, on December 29, 1869, for a section of said road beginning at the westerly end of the last mentioned section, and extending thence twenty and two-tenths ($20\frac{2}{10}$) miles to the easterly end of the first mentioned section, of twenty miles, beginning at San José.

"That all those statements were, upon their being made, filed with said Surveyor General, and he did forthwith, upon the filing of each statement respectively, and at the request of said company, notify said commissioners. That said commissioners did thereupon examine said sections of said road, and made their respective reports thereon, to the same effect as upon the first section of said road, as aforesaid, said reports

being made, respectively, on the 29th day of April, 1869, and the 13th of October, 1869, and the 6th day of January, 1870.

"That each of the four reports of said commissioners was thereupon filed with the Secretary of the Interior, and he thereupon recommended the acceptance of the same, and the issue of the bonds and patents for lands due on account of said sections of road, agreeably to the provisions of said Pacific Railroad acts; and thereupon the President of the United States approved the same, and ordered the Secretary of the Interior and the Secretary of the Treasury to carry the said recommendation into effect, the first of which approvals by the President of the United States was made on the 4th day of December, 1866, and the last on the 21st day of January, 1870. That the four sections above mentioned comprise the whole of said road, from the city of San José to the city of Sacramento. That said road has been in full operation and has been operated for the transportation of passengers and freight since the 9th day of June, A.D. 1869.

"18. That thereafter there was issued, on the 23d day of November, 1875, to said Central Pacific Railroad Company (?), under the signature of the President of the United States, attested by the recorder of the General Land Office, and under the seal of the General Land Office, what purported to be, and in form was, a patent.

"That the patent was in the usual form of the patents issued by the United States to the several railroad companies, under and in pursuance of said Pacific Railroad acts of Congress.

"19. That said patent described and purported to convey to said railroad company the several tracts of land mentioned and described in said bill of complaint.

"20. That all of said lands described in the bill of complaint herein are opposite to, and within the 25-mile limits on each side of, the route or line of said railroad company's road, as laid down on the map filed by said Central Pacific Railroad Company of California in the Department of the Interior on the 8th day of December, 1864."

Besides these admissions a large amount of evidence was

taken in the case, and a final hearing was had before the court below in November term, 1886, and a decree was made dismissing the bill of complaint.

The court, in its opinion, held, amongst other things:

1. That the map of the route of the Western Division of the Central Pacific Railroad of California, filed with the Secretary of the Interior December 8, 1864, is the map of the general route, and not of the line as "definitely fixed," within the meaning of the land-grant act of 1862.

2. That the map of the route of said road as finally located and constructed, filed with the Secretary of the Interior February 1, 1870, and accepted as such by that officer, is the map of definite location.

3. That the Moquelamos grant was finally rejected February 13, 1865, after which the lands within the exterior boundaries of the grant ceased to be *sub judice* and became public lands, to the odd sections of which, within twenty miles of the line of the road, the right of the railroad company attached, and became indefeasible, immediately upon the filing of the map of definite location of the road, and the acceptance thereof as such by the Secretary of the Interior.

4. That as, from the year 1855, the land between the Moquelamos and Calaveras rivers, east of the range (or meridian) line between ranges 7 and 8, was treated by the government as lying outside of the Moquelamos grant claim, and as being public land, by running the section lines and filing plats of survey, and selling some of the lands, and opening the others to private entry, etc., the government should be held in a court of equity to be estopped as against the grantees of the patentee from now alleging that those lands are within the boundaries of the claim.

5. That the withdrawal of the lands upon filing the map of the general route of the road, for twenty-five miles on each side of the line indicated, protected the lands against the attaching of any other right as against the railroad company until the filing of the map of definite location.

Without expressing, at present, any opinion on the conclusions thus reached by the Circuit Court, we will proceed to

examine, 1st, Whether the land in question was actually within the outside limits of the pretended Moquelamos grant? If it was, and if the title of the railroad company accrued whilst the grant was under judicial examination, we will inquire, 2dly, Whether, for that reason, the railroad grant was prevented from taking effect within the said outside limits?

The defendants adduced evidence to show that the greater part of the lands in question were not embraced within the limits of the grant. Those limits are fairly well defined on three sides; the northern boundary being the Moquelamos or Moquelumne River; the southern the lands of Mr. Gulnak, (being the "Campo de los Franceses;") and the western being the "estuaries of the shore," or the marshes bordering on the San Joaquin River, not very clearly defined in outline, but sufficiently so to serve as a boundary. On the east side, the supposed grant is bounded "*con la sierra immediata;*" — "by the adjacent ridge of mountains" or "by the adjacent sierra." This is interpreted as meaning to exclude the sierra itself; in other words the grant extends, according to its terms, to the commencement of the mountain or sierra.

One of the witnesses, R. C. Hopkins, who had been employed by the government for more than thirty years in the Surveyor General's office in California, in connection with the Spanish land grants, making translations and testifying in the courts, was asked to translate the descriptive portion of the Moquelamos grant, which he did as follows: "Eleven square leagues on the Moquelamos River, which bounds on the north with the southern shore of the said river, on the east with the contiguous sierras, on the south with the lands of Mr. Gulnak, and on the west with the estuaries of the beach." He further testified that when "sierra immediata" is called for as a boundary, the "sierras" are excluded.

Now, if there were any mountain ridge or sierra in the neighborhood of the other boundaries called for, lying to the eastward, and in the vicinity of the Gulnak track, the solution would be easy. But the Sierra Nevada is the only mountain in that direction, and that is sixty or seventy miles east of the line of the railroad, and still farther from the marshes of

the beach forming the western boundary of the grant, — an extent which would give a total area of over eighty square leagues. The defendants contend that such an extension of the outside boundaries of the grant (supposing it to have been a real grant) cannot be presumed to have been in the minds of the parties; and they produce evidence to show that, starting from the marshes on the west, and proceeding eastwardly between the Gulnak tract and the Moquelumne River, the land is level valley land as far as the "Jack Tone road," (which runs north and south on the range line between ranges 7 and 8 east, — about seven miles east of the railroad;) and that beyond this road the lands are hilly, covered with timber and brush, and gradually increase in altitude above the sea-level up to the Sierra Nevada itself, becoming more broken and precipitous as we proceed.

As an example of this evidence, the testimony of Edward E. Tucker, an experienced surveyor in that country, and official surveyor of San Joaquin County, may be referred to. Amongst other things he says:

"I will say that from a line east of what is called the Jack Tone road an irregular line about, well, I suppose, averaging say two miles east of the road, some places it comes within three-quarters of a mile of the Jack Tone road, and at other places it is two or three miles from it — the ground becomes more or less broken and hilly, and in some places there are well-defined hills, and in other places it is what would be designated, I suppose, rolling land; but the general character of the country from the point I have designated, east, between the Moquelumne and Calaveras rivers, is irregular. It is up and down and generally rising; that is to say, the farther east a person goes the higher the hills become and the more irregular they are until the county line is reached. There are a number of places where there are quite high hills, and some deep elevations, and other places where perhaps a whole section would be what we call rolling land. There are no very steep hills or very high hills in a particular section, but it is what I would call, generally speaking, hilly land, the whole of it, and a rising tendency going towards the east.

There are a great many sections and quarter sections that I could locate from memoranda that I have in my book, hills. I could designate particularly, quarter sections, if required, but generally from that line indicated, east, the country is hilly. . . . Q. 50. What can you say generally with reference to the elevation of the country going east from the line indicated by you as marking the division line between the plane land and the well-defined hills near the Jack Tone road, and between the Moquelumne and Calaveras rivers? A. The country as I described it before — some of it is rolling, some rough, hilly and broken; but it is all gradually, and some very rapidly ascending. It is constantly ascending; that is, the hills, as you go east, are higher than.— they keep getting higher as you go east. . . . Q. 54. In your opinion as a surveyor and civil engineer where, with reference to the tract of country between the Calaveras and Moquelumne rivers, does the Sierra Nevada range of mountains begin as a range or system? A. In my opinion a range of mountains begins — what you might properly call the base of the mountains, — on the plains where the land commences to go up regularly, and the hills are well defined — what are generally called foot-hills of the mountains; and in this instance I think the mountains begin where I have drawn that heavy red line on this diagram, Exhibit 18. I, of course, want it understood that I am not stating that those are mountains down there. I do not claim that they are mountains. I claim that they are well-defined hills, and that they are regular from there east. They run right into the mountains and there is no way of drawing a line from them mountains east without going over hills; that is, a north and south line."

The witness further testified on cross-examination, as follows:

"Q. 1. Did you hear, or come to know from anybody, that the rolling lands in range 9 east, any part of it, was ever designated as any part of the Sierra Nevada Mountains? A. No sir. Q. 2. Did you ever know or hear of the rolling land in range 10 east being ever designated as part of the Sierra Nevada Mountains? A. A great deal of land in both those ranges

has always been referred to by myself and others in speaking of it, as foot-hills. We never call it the Sierra Nevada Mountains; we speak of it as foot-hills — going up to the mountains. Q. 3. Did you ever hear of rolling hills, if any there be, in range 8, designated as Sierra Nevada Mountains? A. No, sir. I have heard that spoken of in the same manner — as foot-hills, but not as mountains."

This seems to us to be a fair exhibit of the general evidence on the subject. The complainant produced a number of witnesses to show that there is a mountain, called Bear Mountain, east of range 11, commencing at the eastern side of said range, which would be twenty-four miles east of the Jack Tone road, thirty-one miles east of the railroad, and from thirty-six to forty miles east of the marshes of the San Joaquin. But the parties concur in considering the Moquelamos grant as comprised between the Moquelumne River on the north and the Calaveras River on the south; and this Bear Mountain is entirely south of the Calaveras. There is north of it, and separated from it by the Calaveras River itself, a hill, called Central Hill, but it is no more of a mountain than many other of the high and abrupt hills at that distance eastward from the railroad. One of the most intelligent of the complainant's witnesses referred to was a Mr. Terry, a surveyor and teacher. The following is the material part of his examination on the subject:

"Q. 3. State whether or not, as a surveyor, you have been engaged at any time by the United States to survey public lands. A. I have.

"Q. 4. State what you surveyed in that neighborhood of country as United States surveyor. A. Townships four and five north, ranges eleven and twelve east, Mount Diablo base and meridian.

"Q. 5. State whether you know a mountain in that locality known as Bear Mountain. A. Yes, sir; and sometimes that range of mountains is called Hog Back. But it is laid down as Bear Mountain on the maps, and is generally called so by surveyors.

"Q. 6. Please explain the general features, the condition,

and appearance of that mountain known as Bear Mountain. A. Well, it is a low mountain. The north end of it is covered with chaparral or shemisel, or whatever it is called.

"Q. 7. How in regard to its extension northward? A. It does not extend north of the Calaveras River.

"Q. 8. Do you know a mountain or high elevation known as Central Hill? A. Yes, sir.

"Q. 9. State what connection there is, if any, between Central Hill and Bear Mountain. A. There is no connection that I know of. The Calaveras River runs between them."

"Q. 11. State whether you know the locality north and south from and including Bear Mountain, to and including Central Hill, and for a few miles north of that. A. Yes, sir; that was in my contract. I travelled all over that range of hills in surveying.

"Q. 12. Did you survey all that country? A. Yes, sir; that was in my contract.

"Q. 13. Please give a general description, and as particular a description as you can, of that country north and south from and including Bear Mountain, to and including a few miles north — say five miles north — of Central Hill. A. There is a low range of hills running from the Calaveras River northerly — perhaps a little bit east or west of north — that is pretty hilly. That is from the west boundary, bluff, or bank, as you may call it, of the Calaveras River and of Chili Gulch. That is in townships four and five north, range eleven east.

"Q. 14. Describe the character of that land. A. It is hilly land; some of it is agricultural. I have surveyed several mines in there about Central Hill and further up. I do not know as I can tell exactly how those mines are located. The hilly lands of which I have been speaking are those north of the Calaveras River.

"Q. 15. State what the general character and appearance of Bear Mountain is. A. It is a low mountain, and there is considerable oak and pine timber on it; but on the north end there is chaparral. Perhaps a mile up, running south, is covered with this brush.

"Q. 16. Does not Bear Mountain appear conspicuous and

in full view for, say, ten or twelve miles west of it? A. Yes, sir; from most points on the west it does. Ordinarily, this Bear Mountain is within sight for several miles down here to the west. I used to travel over that country to the west of Bear Mountain and between the rivers Moquelumne and Calaveras a good deal."

We do not perceive that this evidence shows the existence of a sierra at this point, especially between the two rivers. But even if it did, it is still nearly forty miles east of the San Joaquin marshes, and the contents of the entire territory within the granted limits would be over fifty square leagues; — an extent of country which, compared with the quantity of lands granted (eleven leagues), cannot, any more than can the eighty square leagues embraced within the limits of the Sierra Nevada, be presumed to have been within the intention of the parties. It would require clear and positive evidence to establish such a result.

The defendants contend that the commencement of the hilly land at or near the Jack Tone road is the true commencement of the "adjacent sierra" named in the grant; and that the hilly and broken land east of that road is all comprehended in the foot-hills of the mountain, and excluded from the grant. In confirmation of this view they not only rely on the topographical evidence which has been noticed, but on the fact that when the claim to the Moquelamos grant was first presented to the Board of Land Commissioners in 1852, and for some time afterwards, the petitioner, Andres Pico, did not pretend or claim that the grant extended farther east than the Jack Tone road; and on the further fact, that the Surveyor General for California, in surveying the public lands and delimiting the boundaries of unconfirmed grants, under the authority conferred upon him by the appropriation act of August 31st, 1852 (10 Stat. 91), assumed the range line between ranges 7 and 8 (or the Jack Tone road) to be the utmost eastern boundary of the Moquelamos grant, and made his surveys up to that line, and no farther. And in September, 1864, when further surveys were proposed, the attorneys of Pico gave notice to the Surveyor General that the lands

in townships 2, 3, and 4, south of the Moquelumne River, in ranges 5, 6, and 7 east, (that is, the ranges immediately west of the Jack Tone road,) were claimed by Pico under the Moquelamos grant, and that the said claim had been appealed to the Supreme Court of the United States, and was then pending; and requested the Surveyor General to suspend proceedings for preëmpting said land, or any part thereof. The quantity of land thus claimed to be within the said grant was more than twice the amount required to satisfy the grant, showing that the limits named in the notice did not refer to a specific location of the eleven leagues, but to the outside limits of the grant. This evidence, it is true, might not of itself be binding as against the government; but, taken in connection with the acts of the government itself, and the conduct of its officials, from high to low, acquiescing in this view, it shows a state of things, a concord of words and acts between the parties interested, which, on a question of boundary, is not only admissible, but entitled to much weight, especially after so long a period elapsed before this suit was instituted.

Another circumstance relied on to show that the limits of the grant did not extend, at most, farther east than the commencement of the hills near the Jack Tone road, is, that the southern boundary called for is the land of Gulnak. This land is conceded to be the French Camp Grant, or Rancho Campo de los Franceses. And this grant was so determinately located by the accurate *diseño* annexed to it, that its position was established without difficulty, and has never been seriously questioned. As thus located, its northern line coincides in part with the Calaveras River, being situated a little to the north of the river towards the west, and the whole tract lies altogether west of the Jack Tone road, and does not, at the nearest point, approach it within less than half a mile. So that, if the Moquelamos grant (as required by its description) is to be bounded on the south by the Gulnak tract, it cannot itself extend to the east of said road without being forced to do so by the call of some distinct natural object.

On the whole, we are satisfied that the outside boundary

limits of the Moquelamos grant, as called for in the grant itself, do not extend east of the Jack Tone road, or the edge of the hills commencing near the same. This result would dispose of the present case with regard to nearly all the land in question therein. But as some of it lies west of said road, in range 7, and as the railroad land-grant extends to the west of said road, it will be necessary to examine the other question referred to, namely: If the lands in controversy did lie within the exterior limits of the Moquelamos grant, and if the title of the railroad company did accrue whilst that grant was under consideration in the courts, did those facts prevent the railroad land-grant from taking effect?

The Moquelamos grant belongs to that class of grants which may properly be called floats; that is, grants of a certain quantity of land to be located within the limits of a larger area. Mexican grants were of three kinds: (1) grants by specific boundaries, where the donee is entitled to the entire tract, whether it be more or less; (2) grants of quantity, as of one or more leagues within a larger tract described by what are called outside boundaries, where the donee is entitled to the quantity specified, and no more; (3) grants of a certain place or rancho by name, where the donee is entitled to the whole tract according to the boundaries given, or if not given, according to its extent as shown by previous possession. *Higueras* v. *United States*, 5 Wall. 827, 834. In the first and third kinds, the claim of the grantee extends to the full limits of the boundaries designated in the grant or defined by occupation; but in the second kind, a grant of quantity only, within a larger tract, the grant is really a float, to be located by the consent of the government before it can attach to any specific land, like the land warrants of the United States. A float may be entitled to location either on any public lands in the United States, or only in a particular State or Territory, or within a more circumscribed region or district. Its character remains the same. The present grant is one of this kind. If it only extends to the Jack Tone road, as we suppose, it is still largely in excess of the quantity granted. If it extends, as the complainant insists, to the Bear Mountain or the Sierra

Nevada, the region embraced would be immensely enlarged, comprising over fifty square leagues in the one case, and over eighty in the other. Can it be that such an extensive region was under interdict, as reserved land, absolutely exempt from disposition, even by Congress, during the whole period covered by the litigation respecting the validity of the grant, which, in the end, even if found valid, was only for the quantity of eleven square leagues? The investigation continued thirteen years. The grant was found to be a wretched fraud. Even if signed by Pico, it was got up after the Mexican authority had ceased, and was never confirmed by the Departmental Assembly, as no such assembly then existed; and at the date on which it purports to have been confirmed, the Departmental Assembly was not in session. It was, therefore, for good cause that it was rejected by the courts.

Laying all this aside, however, and looking at the claim as one fairly *sub judice*, we may repeat our question, whether it can be possible that so great a region of country was to be regarded as reserved from alienation for so small a cause — an ordinary eleven-league grant? It is contended that the case of *Newhall* v. *Sanger*, 92 U. S. 761, has concluded this question by an answer in the affirmative. This case will be examined hereafter. Meantime let us look at the nature of the supposed case. A grant of eleven square leagues is made out of a country seventy or eighty miles in length, and from six to ten in width, containing over eighty square leagues; and this whole eighty leagues is supposed to be retired from the disposable public domain for a period of years, no one knows how long. Does this look reasonable?

One or two observations may be made calculated to show the precise question in a still stronger light. *First.* It is in the option of the government, not of the grantee, to locate the quantity granted; and, of course, a grant by the government of any part of the territory contained within the outside limits of the grant only reduces by so much the area within which the original grantee's proper quantity may be located. If the government has the right to say where it shall be located, it certainly has the right to say where it

shall not be located; and if it sells land to a third person at a place within the general territory of the original grant, it is equivalent to saying that the quantity due to the original grantee is not to be located there. In other words, if the territory comprehended in the outside limits and bounds of a Mexican grant contains eighty leagues, and the quantity granted is only ten leagues, the government may dispose of seventy leagues without doing any wrong to the original grantee. This was the Mexican law, and of course it is our law. *United States* v. *Armijo*, 5 Wall. 444, 449. In practice, it is true, our authorities, in administering the public lands, have generally allowed the original grantee to make his own selection of the point where he will have his quantity located, provided he has it all located together in one tract. But this is a matter of favor, and not a matter of right. If this were not so, the right of way granted for the railroads by Congress would be subject to question and litigation. There cannot be any doubt, however, of the validity of these grants. The cases which show the law on this subject are numerous; it is only necessary to refer to a few of them. The following may be consulted: *Fremont* v. *United States*, 17 How. 542, 558, 565; *United States* v. *Armijo*, 5 Wall. 444; *Hornsby* v. *United States*, 10 Wall. 224, 234–5; *Henshaw* v. *Bissell*, 18 Wall. 255, 266–7; *Miller* v. *Dale*, 92 U. S. 473, 476–7; *Van Reynegan* v. *Bolton*, 95 U. S. 33, 36.

According to this rule of law, though the Moquelamos grant had been unquestionably genuine and valid, the government would have had a right to dispose of the whole territory east of range 6 without infringing in the slightest degree the rights of Pico, who would still have had his eleven leagues at the western extremity of the territory. Any construction of the laws which would tend to trammel and obstruct this right of the government, and render its acts in making alienations void, should be made with great caution and a careful consideration of the necessary import of the terms of such laws. An illustration of the absurdity which may be involved in extending the supposed reservation from sale and alienation to this kind of grants is shown in the large extent of country which

has been covered by some of them known to the records of this court. In 1822 a grant of twenty leagues square, or four hundred square leagues of land, was made by the Supreme Government of Mexico to President Yturbide, to be located in Texas. In 1835 the Mexican congress authorized his heirs to locate the land in New Mexico or in Upper or Lower California. In 1841 it was decreed that it should be located in Upper California — that is, the present State of California. This claim was actually presented to the Board of Land Commissioners, and appealed to the District Court and thence to this court. Now, according to the contention of the complainant in the present case, all California was interdicted territory during the pendency of that claim before the board and in the courts. The case is reported in 22 Howard, 290, *Yturbide's Executors* v. *United States.* This case arose under the same law as that upon which the case of *Newhall* v. *Sanger* was based — the act of March 3d, 1851. If a reservation of an entire territory is to be implied from a floating grant of quantity within it, then, logically, every float, or land warrant issued by the government, should, until actually located, operate as a reservation of the entire body of public lands.

We can well understand that Indian reservations and reservations for military and other public purposes of the government should be considered as absolutely reserved and withdrawn from that portion of the public lands which are disposable to purchasers and settlers — for, in those cases, the use to which they are devoted, and for which they are deemed to be reserved, extends to every foot of the reservation. The same reason applies to Mexican grants of specific tracts, such as a grant for all the land within certain definite boundaries named, or all the land comprised in a certain rancho or estate. But this reason does not apply to grants of a certain quantity of land, within a territory named or described, containing a much larger area than the amount granted, and where, as in the present case, the right of location within the larger territory is in the government, and not in the grantee. In such case, the use does not attach to the whole territory, but only to a part of it, and to such part as the government chooses to designate, provided the requisite quantity be appropriated.

The case of the *Leavenworth &c. Railroad Co.* v. *The United States,* 92 U. S. 733, preceded the case of *Newhall* v. *Sanger,* and was relied on in the latter case. But the Leavenworth case related to an Indian reservation, and the legislative grant upon which it depended, 12 Stat. 772, entitled, " An act for a grant of lands to the State of Kansas, in alternate sections, to aid in the construction of certain railroads and telegraphs in said State," had an express proviso, " that any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be. and the same are hereby, reserved to the United States from the operations of this act, except so far as it may be found necessary to locate the routes of said road and branches through such reserved lands, in which case the right of way only shall be granted." The land grant in that case was construed as taking effect immediately, and as vesting a present title in the State of Kansas, though a survey of the lands and a location of the road were held to be necessary to give precision to it, and attach it to any particular tract. The treaty with the Great and Little Osage tribe of Indians, made June 2d, 1825, which contained a cession to the United States of certain land, contained this clause, to wit : " Within the limits of the country above ceded and relinquished there shall be reserved to and for the Great and Little Osage tribe or nation aforesaid, so long as they shall choose to occupy the same, the following described tract of land." The described tract embraced the land in question in the cause, and the court held that it was no part of the public lands of the United States, and that no part of it passed to the State of Kansas under the grant, though the railroad passed through it. In our judgment that case differed materially from the one now before us. The whole reservation was appropriated to the use of the Osage nation as long as they chose to occupy it.

The case of *Newhall* v. *Sanger,* 92 U. S. 761, on which the complainant confidently relies, was argued and decided shortly after the Leavenworth case. It arose upon a bill to quiet title

to a quarter section of land situated in township 3 N., range 7 E., and therefore west of the Jack Tone road, and within the then admitted limits of the Moquelamos grant now under discussion. We have taken the pains to examine the original record. The bill is comprised in a page and a half, and the whole record in six pages. Sanger, the complainant below, claimed title through the Western Pacific Railroad Company, to whom a patent had been issued in April, 1870, in professed compliance with the requirements of the acts of Congress of 1862 and 1864. The bill alleges that Newhall claimed title to the same land under a subsequent patent, which recited that the first patent had issued by mistake to the Western Pacific Railroad Company, because the land was within the exterior limits of a Mexican grant called Moquelamos. The bill alleged that this grant was rejected by the final decision of this court in December term, 1864, before the reservation of lands for the railroad was made; but that the President, in making the second grant, pretended that the Moquelamos grant was not rejected until the 13th day of February, 1865, after the reservation for railroad purposes, claiming the right to look into the minutes of this court to ascertain the precise day when the claim was rejected, and thereby disregarding the mandate; whereas the complainant contended that the rejection took effect from the first day of the term.

This was the substance of the bill. The only issue it raised was as to the time when the rejection of the grant legally took effect, whether at the beginning of the term (December 5th, 1864), or on the actual day of rendering the judgment (February 13th, 1865); one date being before and the other after the withdrawal of the lands from sale for the benefit of the railroad company; and such withdrawal being assumed to be the act by virtue of which the railroad title accrued. There was nothing in the bill to show that the boundaries named in the grant contained any more than eleven square leagues of land, the quantity granted.

The bill was demurred to, the cause was submitted without argument, and the demurrer was overruled. The defendant adhering to his demurrer, a decree was entered for the com-

plainant. An appeal was then taken to this court, the cause was submitted on printed briefs, and the decree of the Circuit Court was reversed. The opinion took no notice of the fact (which did not appear in the record) that the grant was one of that class in which the quantity granted was but a small part of the territory embraced within the boundaries named. It proceeded throughout as it would have done on the supposition that the grant covered and filled up the whole territory described. It simply dealt with and affirmed the general proposition that a Mexican grant while under judicial investigation was not public land open for disposal and sale, but was reserved territory within the meaning of the law, — a proposition not seriously disputed. On the question of time when the rejection of the grant took effect, it held with the defendant, that the records of this court could be consulted to ascertain the precise day of rendering judgment. After deciding this point, there was no difficulty, under the admissions of the bill, in reversing the decree of the Circuit Court. The opinion, however, examined somewhat at large the grounds on which it should be held that Mexican grants (whether valid or invalid) while under judicial consideration, should be treated as reserved lands. The principal reason was that they were not "public lands" in the sense of congressional legislation; those terms being habitually used to describe such lands as are subject to sale or other disposal under general laws. The Pacific Railroad acts of 1862 and 1864 only granted, in aid of the railroads to be constructed under them, "every alternate section of public land . . . not sold, reserved, or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached at the time the line of said road is definitely fixed." The lands comprised in a Mexican grant, it was held, must be regarded not as "public lands" but as "reserved" lands, because, by the treaty with Mexico, all private property was to be respected. And when the act of March 3d, 1851, created a board of commissioners to examine all claims to Mexican grants, the 13th section declared "that all lands the claims to which have been finally rejected by the commissioners in the manner herein provided,

or which shall be finally decided to be invalid by the District or Supreme Court, and all lands the claims to which shall not have been presented to the commissioners within two years after the date of this act, shall be deemed, held, and considered, as part of the public domain of the United States, " 9 Stat. 633 ; implying that until then they were not part of the public domain. The same conclusion was thought to be inferred from the act of March 3d, 1853, which introduced the land system into California.; the sixth section of which, amongst other things, exempted from preëmption· and sale "lands claimed under any foreign grant or title." And this reservation, the court argued, would apply equally to grants that were fraudulent and void, as to those that were valid; for, until investigated, it could not be known which were valid and which were void.

This reasoning of· the court in *Newhall* v. *Sanger* is entirely conclusive as to all definite grants which identified the land granted, such as the case before it then appeared to be; but is it fairly applicable to floats? that is to say, grants of a certain quantity to be located within a larger tract of territory, whether of limited extent, marked by certain bounds, or anywhere in the State, as in the case of Yturbide? Many small grants, of only a few leagues, were susceptible of location in large territories. The Alvarado grant, claimed by Fremont, *Fremont* v. *United States*, 17 How. 542, was only for ten square leagues within a region containing upwards of a hundred square leagues. The description in the grant was "the tract of land known as Mariposas, to the extent of ten square leagues, within the limits of the Sierra Nevada and the rivers known by the names of the Chanchilles, of the Merced, and of the San Joaquin." Did all this vast region cease to be the public domain of the United States for the sake of the ten leagues which constituted the actual grant? Would not such a conclusion have been unreasonable, prejudicial to the public interest, and entirely unnecessary for the protection of the grantee? It may be that the Land Office might properly suspend ordinary operations in the disposal of lands within the territory indicated, and in that sense they might not be con-

sidered as public lands; but why should they not be regarded as public lands disposable by Congress itself, care being taken to preserve a sufficient quantity to satisfy the grant?

As we have already seen, there can be no doubt that a grant made by Congress within the limits of a territory subject to a Mexican float, would take precedence of the float if sufficient land remained to satisfy it. The only question is, whether the surplus land so at the disposal of Congress may be regarded as public land within the meaning of the railroad aid grants. We are disposed to think that it may be, and that as to grants of this character, floating grants as they may be called, the railroad aid grants are not deprived of effect provided a sufficient quantity lying together be left to satisfy the grant. In this case no difficulty could occur in carrying out this view. The territory described has sufficient extent west of range 7 to satisfy the grant of eleven leagues, and there seems to be no valid reason why it should not be satisfied from this part. Of course, the satisfaction of the grant is a fiction; for it never had any validity. But the part referred to would be sufficient to satisfy it, if it had been a valid grant. And as the government had the right of location, and has made a grant of its title to the railroad company, the company may exercise the same right subject to the like conditions. The company has made its election to take its lands in range 7 and the ranges that lie easterly thereof; and this option leaves the tract west of range 7 (subject to its right of way) open to disposal in the ordinary manner of other public lands.

There is really nothing in the decision of *Newhall* v. *Sanger* in conflict with the views here expressed; because the court did not have before it the case of a floating grant.

In a number of cases decided since the decision in *Newhall* v. *Sanger*, that case has been referred to with approbation; and in some of them expressions have been used as if the question of floating grants to be located in larger territories had been decided therein. But we have seen that this is not correct, and we are not aware of any case in which this class

of grants has been actually involved and has formed the subject of decision.

> *The decree of the Circuit Court is affirmed in this and the*
> *other cases argued with it. In consequence of the death*
> *of Kate D. McLaughlin, the decree will be entered as of*
> *the first day of the term, nunc pro tunc.*

No. 11, DeWitt *v.* McLaughlin ; No. 12, Friend *v.* Wise. In error to the Circuit Court of the United States for the District of California. These cases were, by the above direction of the court, affirmed, and judgment entered *nunc pro tunc* as of October 10, 1887.

*Affirmed.*

*Mr. W. J. Johnston* and *Mr. M. D. Brainard* for plaintiffs in error.

*Mr. A. L. Rhoads* and *Mr. Henry Beard* for defendants in error.