UNITED STATES *v.* SOUTHERN PAC. R. Co. *et al.* (Nos. 67, 68, 69, Consolidated.)

SAME *v.* COLTON MARBLE & LIME Co. *et al.* (No. 88.)

(*Circuit Court, S. D. California.* March 6, 1891.)

1. PUBLIC LANDS—RAILROAD COMPANIES—PLEADING.
   Act Cong. March 3, 1871, granted certain lands to the S. P. R. R. Co., and provided that if its route, when designated, should be found to be on the line of any other road to which land had also been granted, the amount theretofore granted should be deducted from the quantity thereby granted to the S. P. R. R. Co., so far as their routes should be on the same general line. In bills brought by the government to set aside a patent to the S. P. R. R. Co., it is alleged that the route of the A. and P. Co., to which land had also been granted, and the route of the S. P. R. R. Co., "cross each other in the state of California." *Held*, that this allegation does not bring the land within the exception of said act, and that under such allegation, even if proof showed that the routes are in fact upon the same general line, it would not avail the government.
2. RAILROAD COMPANIES—CONGRESSIONAL GRANT.
   Act Cong. July 27, 1866, fully conferred upon the S. P. R. R. Co. the right to build the road described in and earn the land granted by that act, without the authority of the state legislature.

**3. Same—Amalgamation—Recognition by Congress.**

Act Cong. July 27, 1866, recognized the S. P. R. R. Co., organized under a general law of California, and made it certain grants of land. Pursuant to Act Cal. Leg. March 1, 1870, authorizing any corporation already formed, or thereafter to be formed, to amend its articles of association, and Act April 4, 1870, in terms authorizing the S. P. R. R. Co to file new and amendatory articles of association to enable it completely to conform to Act Cong. July 27, 1866, S. P. R. R. Co., and other railroads, October 11, 1870, filed articles amalgamating and consolidating themselves into a new corporation,—S. P. R. R. Co. Act Cong. March 3, 1871, authorized the S. P. R. R. Co. of California (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa pass, by way of Los Angeles, to the T. P. R. R. at or near the C. river, with the same rights, grants, and privileges, and subject to the same limitations, restrictions, and conditions, as were granted to said S. P. R. R. Co. of California by Act July 27, 1866. *Held*, that congress thereby recognized that the S. P. R. R. Co. of California, existing March 3, 1871, under the articles of amalgamation and consolidation of October 11, 1870, was the same S. P. R. R. Co. to which the grant of July 27, 1866, was made. The authority conferred on said company by the act of March 3, 1871, to build the road designated, was made subject not only to the general laws of California 'authorizing railroad corporations to amalgamate and consolidate their interests and amend their articles of incorporation, but to the special act of April 4, 1870.

**4. Same.**

Pursuant to state authority, recognized by and made a part of the congressional grant of March 3, 1871, the S. P. R. R. Co., April 15, 1871, filed amended articles of incorporation; and August 12, 1873, filed, together with the S. P. Branch R. R. Co., articles of amalgamation and consolidation, under the name of the S. P. R. R. Co. *Held*, that while in one sense a new corporation was formed, each was substantially and practically the same S. P. R. R. Co. mentioned in the acts of congress, and was so recognized by congress, and that the articles of amendment, amalgamation, and consolidation were authorized by congressional as well as by state legislation.

**5. Same.**

Commissioners having from time to time been appointed to report in regard to the construction of the Southern Pacific Railroad, the road having been accepted by the president, and having been used by the government in the transportation of mail, military stores, etc., *held*, that these acts were acts recognizing the defendant company as the S. P. R. R. Co., to which the act of March 3, 1871, applies, and that the defendant company, being subject to burdens imposed by the act, is entitled to the benefits conferred by it as a consideration for those burdens.

**6. Successors and Assigns.**

Act Cong. July 27, 1866, having expressly granted lands to the S. P. R. R. Co., its successors and assigns, it is *held* that, if the consolidated company with the amended articles of incorporation is not technically the same corporation referred to in Act March 3, 1871, it is within the express provisions of the grant, being the successor or assign of said company.

**7. Mexican Grants—When Cease to be Sub Judice.**

When a Mexican grant, by specific boundaries carrying all the lands within the designated boundaries, has been confirmed by a decree which has become final, the said decree specifically pointing out and designating the corners by natural objects on the ground, and the connecting lines, all lands outside those specific monuments and lines, from the date when the decree becomes final, cease to be *sub judice*, if they ever were in that condition, within the meaning of those terms as used by the supreme court in the cases of *Newhall* v. *Sanger*, 92 U. S. 761; *Doolan* v. *Carr*, 125 U. S. 638, 8 Sup. Ct. Rep. 1228; and *U. S.* v. *McLaughlin*, 127 U. S. 428, 8 Sup. Ct. Rep. 1177. Ross, J., dissenting.

In Equity.

*Joseph H. Call*, Asst. U. S. Atty., (*W. H. H. Miller*, Atty. Gen., and *Willoughby Cole*, U. S. Atty., of counsel,) for complainant.

*Joseph D. Redding*, (*Creed Haymond, A. B. Hotchkiss, J. D. Bicknell, C. H. Wilson, H. C. Rolfe, Chapman & Hendrick, Anderson, Fitzgerald & Anderson, Edwin Baxter*, and *J. L. Murphey*, of counsel,) for respondents.

Before SAWYER, Circuit Judge, and Ross, District Judge.

Ross, J. When these cases, which were argued and submitted together, were before the court on demurrers to the amended bills, (39

Fed. Rep. 132,) it was held that the grant to the Atlantic & Pacific Railroad Company of date July 27, 1866, conferred upon that company no right of any nature to any particular piece of land within the indemnity limits of that grant prior to its selection, and, as a consequence, that the fact that lands were within such indemnity limits did not exclude them from the subsequent grant to the Southern Pacific Railroad Company of date March 3, 1871, because of that provision of the act of July 27, 1866, (to which the act of March 3, 1871, referred for the terms of the grant to the Southern Pacific Company,) which reads: "Provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any other railroad company." But because the amended bills showed on their face that the lands in controversy, which are within the indemnity limits of the grant to the Atlantic & Pacific Company and within the primary limits of that to the Southern Pacific Company, were at the time of the grant to the Southern Pacific Company claimed to be within the limits of the Mexican grant San José, which latter grant, it was alleged, was then *sub judice*, and because of that provision of the grant to the Southern Pacific Company to the effect that if the route it was authorized to designate should be found to be upon the line of any other railroad route to aid in the construction of which lands had been theretofore granted by the United States, as far as the routes are upon the same general line, the amount of land theretofore granted should be deducted from the amount granted to the Southern Pacific Company,[1] coupled with the fact then alleged and by the demurrers admitted, that the routes of the two roads were upon the same general line, the amended bills were considered by the court to state, in each of those respects, good cause for annulling the patents issued to the Southern Pacific Railroad Company.

Since the ruling upon the demurrers the bills have been still further amended, and the cases are now submitted for decision upon the proofs taken and the master's report.

The bills as last amended omit the fact theretofore alleged that the routes of the two roads are upon the same general line, and the question decided upon the demurrers in respect to that point is therefore no longer involved. The allegation of the present bills in regard to that matter is that the two routes "cross each other in the state of California, as will more particularly appear" from a certain annexed map. The fact that is made the basis of the exception in question is that the two routes shall be upon the same general line, not that they cross each other. If the two routes are in fact upon the same general line and the government relied upon that fact for a recovery, it was of course essential that the fact be alleged. Not being alleged it cannot avail the complainant even if the proof shows that it exists.

In respect to the "present and prospective" clause of the act of July 27, 1866, I adhere to the views expressed when the cases were consid-

[1] Act Cong. March 3, 1871.

ered on demurrer, in so far as concerns the lands then and now involved, namely, lands within the indemnity limits of the grant to the Atlantic & Pacific Company, and do not care to add anything to what was then said on that point in regard to such lands.

One question remains for decision in each of the cases, namely, Should the patents issued to the defendant company be annulled upon the ground that the defendant, though having the same name, is a different corporation from that to which the grant was made, and that the company to which the grant was made did not build the road and thereby earn the granted lands? And in the consolidated cases Nos. 67, 68, and 69 there remains for decision the further question, Does the case show that the lands in controversy were, at the time of the grant to the Southern Pacific Railroad Company, within the claimed limits of the Mexican grant San José, and was that grant then *sub judice?*

The affirmative of both of these questions is urged with much earnestness on the part of the government.

The Southern Pacific Railroad Company was originally incorporated December 2, 1865, under a general law of the state of California, approved May 20, 1861, (St. Cal. 1861, p. 607,) entitled "An act to provide for the incorporation of railroad companies and the management of the affairs thereof, and other matters relating thereto." The act, among other things, authorized such corporations "to receive, hold, take and convey, by deed or otherwise, the same as a natural person might or could do, such voluntary grants and donations of real estate and other property of every description, as shall be made to it, to aid and encourage the construction, maintenance and operation of such railroad." The act also provided that it should be lawful for two or more railroad companies to amalgamate and consolidate their capital stock, debts, property, assets and franchises in such manner as should be agreed upon by the board of directors of such companies so desiring to amalgamate and consolidate their interests. By the act of congress, approved July 27, 1866, (14 St. 292,) creating the Atlantic & Pacific Railroad Company and empowering it to construct and maintain a continuous railroad and telegraph line from Springfield, Mo., to the Pacific coast, congress recognized the Southern Pacific Railroad Company, organized as aforesaid, and authorized it to connect with the Atlantic & Pacific Railroad at such point, near the boundary line of California, as the Southern Pacific Company should deem most suitable for a railroad to San Francisco.

For the purpose of aiding the construction of the line authorized to be built, and thereby securing the safe and speedy transportation of mails, troops, munitions of war and public stores, congress, by the act of July 27, 1866, granted to the Atlantic & Pacific Railroad Company a right of way over the public domain and also made to it a grant of public lands along the route; and the railroad so to be constructed was declared to be a post route and military road, subject to the use of the United States for postal, military, naval and all other governmental service, and to such regulations as congress might impose for restricting the charges for government transportation. By section 18 of the same act, the Southern

Pacific Railroad Company was given similar grants of land, subject to the limitations and conditions provided in the act, and was required to construct its road under like regulations as to time and manner as provided in respect to the Atlantic & Pacific Company. The grant thus made to the Southern Pacific Railroad Company was accepted by it on the 24th of November, 1866, and on January 3, 1867, it filed in the office of the commissioner of the general land-office a map showing its definite line of route from a point on the southerly edge of the bay of San Francisco, in a southeasterly direction, to a point on the east line of the state of California on the Colorado river, near the Needles. The Southern Pacific Railroad Company was not authorized by its original charter to extend its road to the Colorado river. But with a view to further the intent of the act of congress of July 27, 1866, and to enable the Southern Pacific Company to take the benefit of the grant thereby conferred upon it, the legislature of the state of California, on the 4th of April, 1870, passed an act entitled "An act to aid in giving effect to an act of congress relating to the Southern Pacific Railroad Company," St. Cal. 1870, p. 883, which reads as follows:

"Whereas, by the provisions of a certain act of congress of the United States of America entitled, 'An act granting lands to aid in the construction of a railroad and telegraph line from San Francisco to the eastern line of the state of California, approved July 27, 1866,' certain grants were made to, and certain rights, privileges, powers and authority were vested in and conferred upon, the Southern Pacific Railroad Company, a corporatio.. duly organized and existing under the laws of the state of California; therefore, to enable the said company to more fully and completely comply with and perform the requirements, provisions and conditions of the said act of congress, and all other acts of congress now in force, or which may hereafter be enacted, the state of California hereby consents to said act; and the said company, its successors and assigns, are hereby authorized and empowered to change the line of its railroad so as to reach the eastern boundary line of the state of California by such route as the company shall determine to be the most practicable, and to file new and amendatory articles of association, and the right, power and privileges hereby granted to, conferred upon and vested in them, to construct, maintain and operate, by steam or other power, the said railroad and telegraph line mentioned in said act of congress, hereby confirming to and vesting in said company, its successors and assigns, all the rights, privileges, franchises, power and authority conferred upon, granted to, or vested in, said company by the said acts of congress, and any act of congress which may be hereafter enacted."

Shortly prior to this, and at the same session of the legislature, a general act was passed authorizing any corporation already formed, or thereafter to be formed, to amend its articles of association, Act March 1, 1870, (St. 1869–70, p. 107.) But the act of April 4, 1870, in terms authorized the Southern Pacific · Railroad Company to file new and amendatory articles of association, and this for the avowed purpose of enabling it to more perfectly and completely conform to the act of congress of July 27, 1866; and the rights, privileges and powers conferred by the act of April 4, 1870, on the Southern Pacific Railroad Company were given to it, its *successors and assigns.*

This state legislation, as was decided by the supreme court in the case of *California* v. *Railroad Co.*, 127 U. S. 44, 8 Sup. Ct. Rep. 1073, was not necessary to empower the Southern Pacific Company to build the line of road authorized by the act of congress of July 27, 1866, and thereby to earn the granted lands, for the reason that the right to do so was fully conferred by congress itself. But it was enacted to remove all doubt in respect to the company's power to construct the road, and for the expressly declared purpose of enabling it to comply with the act of congress and thereby to receive the benefits conferred.

It is stipulated by counsel in these cases that on the 11th of October, 1870, the Southern Pacific Railroad Company, the San Francisco & San José Railroad Company, the Santa Clara & Pajaro Valley Railroad Company, and the California Southern Railroad Company availed themselves of the aforesaid acts of May 20, 1861, and April 4, 1870, of the state legislature, and duly filed articles by which they amalgamated and consolidated themselves into a new corporation under the name and style of the "Southern Pacific Railroad Company," and did thereby vest in such new corporation their several capital stocks, debts, properties, assets, roads, telegraphs, lands, franchises, rights, titles, privileges, claims and demands of every kind—the object and purpose of the new corporation being declared in the articles to be—

"To purchase, construct, own, maintain and operate a continuous line of railroad from the city of San Francisco, in the state of California, through the city and county of San Francisco, the counties of San Mateo, Santa Clara, Monterey, Fresno, Tulare, Kern, San Bernardino and San Diego, to some point on the Colorado river, in the south-eastern part of the state of California, a distance of seven hundred and twenty miles, as near as may be; also a line of railroad from a point at or near Tehachapa pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, a distance of three hundred and twenty-four miles, as near as may be. *   *   *"

Such was the Southern Pacific Railroad Company when congress passed the act of March 3, 1871, (16 St. U. S. 573.) By that act congress incorporated the Texas Pacific Railroad Company, with power to construct and maintain a continuous railroad and telegraph line from Marshall, in the state of Texas, to a point at or near El Paso; thence through New Mexico and Arizona to San Diego, pursuing as near as might be the thirty-second parallel of latitude. To aid in its construction, congress gave it, also, the right of way over the public domain, and made to it a grant of public lands along the route. The nineteenth section provided:

"That the Texas Pacific Railroad Company shall be and it is hereby declared to be a military and post road; and for the purpose of insuring the carrying of the mails, troops, munitions of war, supplies, and stores of the United States, no act of the company nor any law of any state or territory shall impede, delay, or prevent the said company from performing its obligations to the United States in that regard; *provided*, that said road shall be subject to the use of the United States for postal, military and all other governmental services at fair and reasonable rates of compensation, not to exceed the price paid by private parties for the same kind of service; and the government shall at all times have the preference in the use of the same for the purpose aforesaid."

The twenty-third section of the act is as follows:

"That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, with the same rights, grants and privileges, and subject to the same limitations, restrictions and conditions as were granted to said Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six; *provided, however,* that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company, or any other railroad company."

In the case of *Railroad Co.* v. *Poole,* 12 Sawy. 544, 32 Fed. Rep. 451, it was contended that at the date of the passage of the act of congress of March 3, 1871, the Southern Pacific Railroad Company was not authorized by its charter to build the line of road from Tehachapa pass, by way of Los Angeles, to connect with the Texas Pacific road, and, as by the twenty-third section of that act that company was "only authorized, *subject to the laws of California,* to construct a line of railroad from a point at or near Tehachapa pass," etc., the grant was necessarily inoperative and void.   The court accepted the fact as there stated, that at the time of the passage of the act of congress the company did not have, according to the laws of California, the legal capacity to build the road on the line designated, and yet held against the contention.   But according to the stipulation of counsel in these cases, the fact was *not* as there stated. At the time of the passage of the act of congress of March 3, 1871, the Southern Pacific Railroad Company was, according to the stipulation of counsel, existing under the articles of amalgamation and consolidation, which was its charter, of October 11, 1870, entered into pursuant to the provisions of the state act already referred to; and, as has been seen, one of the purposes of the corporation as expressly declared in those articles was to construct, own, maintain and operate "a line of railroad from a point at or near Tehachapa pass, by way of Los Angeles to the Texas Pacific Railroad, at or near the Colorado river, a distance of three hundred and twenty-four miles, as near as may be."

By the act of March 3, 1871, congress made this state corporation, with that state authority, one of its agencies in the establishment of the national highway provided for, and authorized it—

"Subject to the laws of California, to construct a line of railroad from a point at or near Tehachapa pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, with the same rights, grants and privileges, and subject to the same limitations, restrictions and conditions as were granted to *said* Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six," (with the proviso already quoted.)

Here was not only a plain recognition by congress that the Southern Pacific Railroad Company of California, existing at the time of the grant of March 3, 1871, under the articles of amalgamation and consolidation of October 11, 1870, was the same Southern Pacific Railroad Company

to which the grant of July 27, 1866, was made, but the authority to build the road designated conferred on that company by the act of March 3, 1871, was in terms made subject to the laws of California. Those laws, as has already been pointed out, not only authorized two or more railroad corporations to amalgamate and consolidate their interests and to amend their articles of incorporation, but the state act of April 4, 1870, expressly declared that the powers therein conferred upon the Southern Pacific Railroad Company, its successors and assigns, were for the very purpose of enabling it, its successors and assigns, to more fully and completely comply with and perform the requirements, provisions and conditions of the act of congress of July 27, 1866, and any other act or acts of congress that might be thereafter enacted.

Pursuant to this state authority, recognized by and made a part of the congressional grant of March 3, 1871, the Southern Pacific Railroad Company, on the 15th of April, 1871, filed in the proper office of the state amended articles of incorporation, and, on the 12th of August, 1873, it filed, together with the Southern Pacific Branch Railroad Company, articles of amalgamation and consolidation under the name of the "Southern Pacific Railroad Company," in both of which articles one of the purposes is stated to be the building of the line from San Francisco through the several named counties, in a southeasterly direction, to the Colorado river, and the building of the line from Tehachapa pass by way of Los Angeles, to connect with the Texas Pacific at or near the Colorado river, and thus to secure to itself the grants, rights and privileges conferred upon it by the congressional grants.

While by the several articles of amalgamation and consolidation, a new corporation, in one sense, was formed, each was substantially and practically the same Southern Pacific Railroad Company mentioned in the acts of congress, and had for its main purpose the building of the lines of railroad therein designated and the obtaining of the land grants for doing so. Congress, in passing the act of March 3, 1871, evidently did not consider that the Southern Pacific Railroad Company, by entering into the articles of amalgamation and consolidation of October 11, 1870, and thereby, in one sense, becoming a "new" corporation, had become a distinct and independent one; for in that very act it designated the Southern Pacific Railroad Company to which that act applied as the same Southern Pacific Railroad Company to which the act of July 27, 1866, applied. Not only so, but the act of March 3, 1871, in terms authorized that company to build the designated road subject to the laws of California, which laws, as has been shown, expressly authorized the amalgamations and consolidations and the amendments of articles that were made. There was therefore congressional as well as state legislation authorizing the articles of amendment, amalgamation and consolidation, and I can see no just ground for holding that the defendant company, which it is conceded built the required road within the designated time, was not the company to which the grant was made.

In other ways, also, the defendant company has been recognized as the Southern Pacific Railroad Company to which the act of March 3,

1871, applies. It has been so recognized by the appointment of commissioners from time to time as the road was being built, to report in regard to its construction; by the acceptance of the road by the president, in its entirety, as having been duly completed under and by authority of the act, and by the use of the road by the government in the transportation of its mail, military stores, etc., pursuant to the provisions of the act. Manifestly, the defendant company cannot justly be held subject to the burdens imposed by the act and yet not entitled to the benefits conferred by it as a consideration for those burdens.

Besides, as said by Judge SAWYER, in the case of *Railroad Co.* v. *Poole, supra:*

"Section 2 of the Atlantic and Pacific act, imported into the Texas and Pacific act by virtue of section 23 of the latter and section 18 of the former, giving to the Southern Pacific Railroad Company of California 'the same rights, grants and privileges, and subject to the same limitations, restrictions and conditions' prescribed in the former act, expressly says the lands are granted to the company, its *successors and assigns.* These words 'successors and assigns' of course mean something. If the consolidated company, with amended articles of incorporation, is not technically the same corporation referred to in the Texas Pacific act, it is substantially and practically so. If not, it is certainly its successor or assign, and is. thus within the express provisions of the grant."

The points above considered are common to all of the cases, and dispose of case No. 88. In the consolidated cases Nos. 67, 68 and 69 the question in respect to the Mexican grant San José remains to be determined.

That grant was for the place called San José and in conformity with the deseño attached to the petition for the grant and within the boundaries therein given. The grant was made by Juan B. Alvarado, at the time governor of Upper California under the Mexican government, and received the approval of the departmental assembly. The claim thereto was presented in September, 1852, by the grantees to the board of land commissioners pursuant to the provisions of the act of congress of March 3, 1851, entitled "An act to ascertain and settle the private land claims in the state of California," (9 St. at Large, 631.) The claim was confirmed by the board of land commissioners, and in December, 1854, the district court, to which the case had been taken on appeal, confirmed the decrees of the board, giving to each of the three claimants an equal undivided one-third part—

"Of the lands of San José granted by Juan B. Alvarado, governor of California, to Ignacio Palomares and Ricardo Vejar on April 15, 1837, and regranted by said governor on March 14, 1840, to said Palomares and Vejar and to Louis Arenas, as described in the grant first mentioned and the map to which the same referred, and which boundaries fully appear from the act of judicial possession [described as follows:] 'Commencing at the foot of a black willow tree which was taken for a corner and between the limbs of which a dry stick was placed in the form of a cross; thence westerly nine thousand seven hundred (9,700) varas to the foot of the hills called "Las Lomas de la Puente" taking for a landmark a large walnut tree on the slope of a small hill on the side of the road which passes from the said San José to the Puente, making a

cut (caldura) on one of the limbs with a hatchet; thence northerly ten thousand four hundred (10,400) varas to the creek (arroyo) of San José opposite a high hill where a large oak was taken as a boundary, in which was placed the head of a beef, and some of its limbs chopped; thence easterly ten thousand six hundred (10,600) varas to the creek (arroyo) of San Antonio, taking for a landmark two young cotton-woods which stand near each other, on the bark of which crosses were made; thence southerly nine thousand seven hundred (9,700) varas to the place of beginning.' "

The decree of the district court became final in 1857. In 1858 the surveyor general for California caused the land thus granted and confirmed to be surveyed,—the survey being made by Deputy Surveyor Hancock. That survey did not include any portion of the lands in controversy here. It was approved by the surveyor general for California on the 14th of January, 1860; but the case shows that it did not receive the approval of the commissioner of the general land-office.

On the 14th of June, 1860, congress passed an act entitled "An act to amend an act entitled 'An act to define and regulate the jurisdiction of the district courts of the United States in California in regard to the survey and location of confirmed private land claims,'" (12 St. at Large, 33,) by which the district courts were given authority to order into court for examination and adjudication the survey of such private claims. This act, however, as was held by the supreme court, did not apply to surveys made prior to its passage unless they had been approved by the surveyor general *and* had been "at the time of the passage of the act returned into the district court, or in relation to which proceedings were then pending for the purpose of contesting or reforming the same."

The grant claimants were not satisfied with the Hancock survey, and subsequent to the passage of the act of June 14, 1860, brought it before the district court for review, in supposed conformity with the provisions of that act; but that court finding that the act did not apply to that survey, on November 21, 1867, dismissed the proceedings and remitted the papers to the surveyor general. In the mean time congress had passed the acts of July 1, 1864, (13 St. c. 194,) and July 23, 1866, (14 St. 220.) The act of July 1, 1864, was entitled "An act to expedite the settlement of titles to lands in the state of California," and by its sixth section provided that it should be the duty of the surveyor general for California to cause all private land claims finally confirmed to be accurately surveyed and plats thereof to be made whenever required by the claimants; provided, that each claimant requesting a survey and plat should first deposit in the district court of the district within which the land was situated a sufficient sum of money to pay the expenses of such survey and plat, and of the publication required by the first section of the act.

The act of July 23, 1866, was entitled "An act to quiet land titles in California," the eighth section of which provided:

"That in all cases where a claim to land by virtue of a right or title derived from the Spanish or Mexican authorities has been finally confirmed, and a survey and plat thereof shall not have been requested within ten months from the passage of this act, as provided by sections six and seven of the act of July

first, eighteen' hundred and sixty-four, to expedite the settlement of titles to lands in the state of California, and in all cases where a like claim shall hereafter be finally confirmed, and a survey and plat thereof shall not be requested as provided by said sections within ten months after the passage of this act, or any final confirmation hereafter made, it shall be the duty of the surveyor general of the United States for California, as soon as practicable after the expiration of ten months from the passage of this act, or such final confirmation hereafter made, to cause the lines of the public surveys to be extended over such lands; and he shall set off, in full satisfaction of such grant, and according to the lines of the public surveys, the quantity of land confirmed in such final decree, and as nearly as can be done in accordance with such decree; and all the land not included in such grant as so set off shall be subject to the general laws of the United States; provided, that nothing in this act shall be construed so as in any manner to interfere with the right of *bona fide* pre-emption claimants."

On the 9th of January, 1868, the surveyor general for California reported to the commissioner of the general land-office that an application had been made to him by one of the grant claimants for a survey of the grant, and in response to that report the commissioner directed that the Hancock survey, made in 1858, and approved by the surveyor general ' January 4, 1860, be published in accordance with the provisions of the act of congress of July 1, 1864. Instead of doing so, the surveyor general, it seems, caused another survey of the grant to be made in August of that year, to-wit, 1868, by Deputy Surveyor Thompson, which survey included a portion of the lands involved in cases 67, 68 and 69, and was approved by the surveyor general.

Both the Hancock and Thompson surveys were subsequently before the commissioner and afterwards before the secretary of the interior for consideration and decision—the claimants contending that the lines of the Thompson survey correctly represented the lines of the grant; and the question of survey was so pending at the time of the grant to the Southern Pacific Railroad Company of March 3, 1871. That question, as the record shows, related to the true location of the natural calls of the grant, and was finally determined by the secretary September 20, 1872, by which decision the lines as represented by the Thompson survey were rejected and those of the Hancock survey, with some modifications, adopted—the direction of the secretary being—

"That the lines of the survey of San José be run as follows: Commencing at the willow at the south-east corner, at the point designated by Hancock as 'large rock in center of water pool, agreed on as the place where the black willow of the juridical possession once existed;' thence westerly along the base of the mountains, so as to include the springs near the ravine, to the black walnut; thence northerly to the oak of the Tueaja; thence north-easterly to the Botello oak; thence easterly in a direct line to a point on the arroyo of San Antonio, 9,700 varas north of the black willow, and thence southerly along said arroyo of San Antonio to the place of beginning."

In accordance with these instructions another survey of the grant was made by the surveyor general, upon which a patent was issued; and as thus surveyed and patented none of the lands in controversy were included in the lines of the grant.

While the final result of these proceedings was a conclusive determination that as a matter of fact none of the lands in controversy ever were within the true lines of the San José grant, they also show beyond doubt that some of them were *claimed* by the grant claimants to be within the boundaries of that grant, and that such claim was made and maintained at the time of the congressional grant to the Southern Pacific Railroad Company of March 3, 1871.

It is contended that the surveyor general had no authority to cause the Thompson survey to be made while the previous survey of Hancock was pending and undetermined, and that the Thompson survey was never considered by the commissioner of the general land-office or the secretary of the interior "as a *survey* but only as an *exhibit.*"

Let all of this be admitted, and the fact that is determinative of the question as to whether the lands in controversy here were embraced by the grant to the Southern Pacific Railroad Company of March 3, 1871, remains the same. Considered only as an "exhibit," the Thompson survey, representing as it did what the claimants contended were the true lines of the grant, was and is evidence of the fact that they *claimed* that the lands embraced by that survey (including a portion of the lands in controversy here) were within the boundaries of the Mexican grant; and that claim was asserted up to the time of the final decision of the secretary of the interior in September, 1872. It is not the validity of such claim, but the fact that it was made, that excludes the lands embraced by it from the category of public lands within the meaning of the railroad land grants, if excluded at all. *Doolan* v. *Carr*, 125 U. S. 632, 8 Sup. Ct. Rep. 1228.

It is urged that because the San José was a grant by specific boundaries and was confirmed with the same boundaries, no land that was not finally ascertained by the land department to be within those boundaries is excluded from the railroad grant, if otherwise within its limits. This is practically to wipe out entirely the doctrine announced by the supreme court in *Newhall* v. *Sanger*, 92 U. S. 761; *Doolan* v. *Carr*, 125 U. S. 638, 8 Sup. Ct. Rep. 1228, and in other cases, that the *status* of lands included in a Spanish or Mexican claim pending before tribunals charged with the duty of adjudicating it was such that they were not included in the phrase "public lands" of the railroad land grants. "Those Mexican claims," said the court in *Doolan* v. *Carr*, "were often described, or attempted to be described, by specific boundaries. They were often claims for a definite quantity of land within much larger out-boundaries, and they were frequently described by the name of a place or ranch. To the extent of the claim when the grant was for land with specific boundaries, or known by a particular name, and to the extent of the quantity claimed within out-boundaries containing a greater area, they are excluded from the grant to the railroad company. Indeed, this exclusion did not depend upon the validity of the claim asserted or its final establishment, but upon the fact that there existed a claim of a right under a grant by the Mexican government, which was yet undetermined, and to which, therefore, the phrase 'public lands' could not attach, and which the stat-

utc did not include, although it might be found within the limits prescribed on each side of the road when located."

In the case of *U. S.* v. *McLaughlin*, 127 U. S. 428, 8 Sup. Ct. Rep. 1177, it was held, that as in the .case of a floating grant the Mexican government retained the right to locate the quantity granted in such part of the larger tract described as it saw fit, and as the government of the United States succeeded to the same right, the latter government might dispose of any specific tracts within the exterior limits of the grant, provided a sufficient quantity was left therein to satisfy the private grant; and, accordingly, that in cases of floats, the railroad land grants might attach to lands within such exterior boundaries provided a sufficient quantity of land was left therein to satisfy the private grant. But while thus modifying what was generally understood to have been the effect of the decision in *Newhall* v. *Sanger*, the Court, in *U. S.* v. *McLaughlin*, proceeded to declare (127 U. S. 455, 8 Sup. Ct. 1190) that "the reasoning of the court in *Newhall* v. *Sanger* is entirely conclusive as to all definite grants which identified the land granted, such as the case before it then appeared to be," but went on to show that it was not fairly applicable to floats.

I do not see how there can well be a decision more directly to the point that in cases of Mexican grants by specific boundaries, lands which are claimed by the grantees to be within those boundaries are excluded from the category of public lands to which the railroad land grants apply, if at the date of the latter the question of the true location of the boundaries of the private grant is pending and undetermined. If to such a case the doctrine of *Newhall* v. *Sanger*, and the other cases approving it, does not apply, it does not apply to any case; for it does not apply to floats, as was pointed out in *U. S.* v. *McLaughlin*, and grants by specific boundaries and by name manifestly stand upon the same footing.

It is contended that as the San José grant was one by specific boundaries the claim ceased to be *sub judice* when the decree of confirmation became final in 1857; that nothing then remained to do but apply the description to the ground and survey the lines. If so, precisely the same thing is true in respect to floats. When the decree of comfirmation in such a case became final, nothing remained to do but locate the quantity and survey the lines. In either case, that duty, except in the matter of such surveys as came within the provisions of the act of congress of June 14, 1860, devolved upon the land department of the government and was subject, first, to the action of the surveyor general, and then, in turn, to that of the commissioner of the general land-office and the secretary of the interior. The records of the land department put in evidence in these cases clearly show that the contest over the survey of the San José grant was in relation to the identity of the natural calls of the grant—the grantees claiming that the true location of the trees and other objects called for in the specific description of the grant would include within those boundaries a portion of the lands in controversy here. If that contention was well founded, undoubtedly the lands so included would not be public lands of the United States. It would seem plain

enough, therefore, that until that question was finally decided it could not be known whether the lands so claimed were public lands or not. Under the laws of the United States the duty of deciding that question devolved, as has been said, upon the officers of the land department. Its ultimate determination was vested in the secretary of the interior. Had he decided that the lines as represented by the Thompson survey were the true boundaries of the grant, such decision would of course have been equally conclusive as the one that was made; and the patent following it would have been a conclusive determination that all the lands embraced within those lines were within the boundaries of the Mexican grant and therefore not public lands to which the railroad grant only could attach. It would seem plain, therefore, that until the contested question of survey was decided it could not be known whether the lands involved in the contest were public or private lands; and until such decision became final, lands so involved were *sub judice* and not public lands within the meaning of the railroad grant act, according to the ruling in the cases referred to, as I understand them.

It results from these views that in case No. 88 there should be a decree dismissing the bill without costs, and in the consolidated cases Nos. 67,68 and 69 a decree in favor of complainant in so far as concerns the tracts of land in controversy which were at the time of the grant to the Southern Pacific Railroad Company of March 3, 1871, within the claimed limits of the San José grant, and as concerns the remainder of the lands in controversy in the consolidated cases, a decree for the defendants—each party to pay its own costs.

SAWYER, J.   After a careful consideration of the question, I am satisfied that those lands embraced in cases Nos. 67, 68 and 69, alleged to have been within the boundary of the rancho San José, and to have been *sub judice*, at the date when the railroad grant attached to the lands granted, were subject to the legislative grant. I have studied with great care the cases of *Newhall* v. *Sanger*, 92 U. S. 761; *Doolan* v. *Carr*, 125 U. S. 638, 8 Sup. Ct. Rep. 1228; and *U. S.* v. *McLaughlin*, 127 U. S. 428, 8 Sup. Ct. Rep. 1177, relied on, and I am unable to find anything in either of them requiring, or justifying, the exclusion of those lands from the operation of the grant. In my judgment, those lands, now in question, were not in any *just sense*, or in the sense contemplated in the decisions in those cases, *sub judice*, at any time after the decree of confirmation, defining by specific metes and bounds, the precise lands confirmed, became final, even if they were so, which is at least, doubtful, at any prior time. That decree pointing out, specifically, the precise lands confirmed, forever settled the rights of the parties, and after it became final, there was no possible ground for claiming anything outside of those boundaries. None of these lands are within the boundaries designated in the decree, or within the exterior boundary of the juridical possession upon which the decree was based. Indeed, as I understand the matter, they all lie from at least one to three miles from those boundaries, and could not by any possibility have been taken in

v.45F.no.9—39

by any survey, conforming to the decree, or have been lawfully included in any survey. After that decree became final the claimants might just as well have claimed land ten, fifteen or more miles, as from one to three miles, distant. The decree settled the rights of the parties, and the limits of the land granted. And that is final. It could not, lawfully, be changed by the surveyor, or any other authority. In the language of the supreme court, in *U. S.* v. *Halleck*, 1 Wall. 455, 456: *"The decree is a finality*, not only on the question of title, *but as to the boundaries which it specifies."* Affirmed: *U. S.* v. *Billing*, 2 Wall. 448; *Higueras* v. *U. S.*, 5 Wall. 834; *Dodge* v. *Perez*, 2 Sawy. 652.

In the *Fossat Case*, 2 Wall. 649, the supreme court held that:

"If a California land claim has been confirmed by a decision of the district court under the act of March 3, 1851, *and decision of confirmation, fixing the boundaries of the tract, stands unreversed, a survey under it is the execution of that decree, and must conform to it in all respects."*

Now in this case, the decree of confirmation which stands unreversed *"fixes the boundaries"* of the grant, *and the survey under it is not a continuation of the litigation, but "the execution of that decree;"* and no lands outside the specific boundaries so fixed and established, no matter what the confirmees may claim, could, lawfully, be included in the survey, or patent. The rights of the parties are, finally, settled, and the land to which the confirmees are entitled, irrevocably, designated, and, distinctly, pointed out.

The language of the decree of confirmation is, substantially, identical with that of the juridical possession, which was ratified and approved by the granting authorities of Mexico, and by its adoption in the decree by the courts of the United States, it, forever, settled the question of location between the United States and the claimants, and, thereby, the lands outside the boundaries ceased to be *sub judice*. All that remained to be done was to execute the decree, by finding the monuments designated, and run the lines between them in a form usual for insertion in United States patents. There was no discretion whatever left in the surveyor, as there is in the case of a float. Those monuments, *and no others*, could be lawfully taken, and there was no possible ground for further claiming lands outside the boundaries so, specifically, designated, and pointed out. The language of the decree of confirmation is clear and unmistakable, and is as follows:

"Commencing at the foot *of a black willow tree, which was taken for a corner, and between the limbs of which a dry stick was placed, in the form of a cross; thence* westerly nine thousand, seven hundred (9,700) varas to the foot of the hills called 'Las Lomas de la Puente,' *taking for a landmark a large walnut tree on the slope of a small hill on the side of the road which passes from said 'San José' to the Puente, making a cut (caldura) on one of the limbs with a hatchet; thence* northerly ten thousand, four hundred (10,400) varas to the creek (arroyo) of San José, opposite a high hill, *where a large oak was taken as a boundary, in which was placed the head of a beef, and some of its limbs chopped; thence* easterly ten thousand, six hundred (10,600) varas to the creek (arroyo) of San Antonio, *taking for a landmark two young cotton-woods which stand near each other, on the bark of which*

*crosses were made; thence* southerly nine thousand, seven hundred (9,700) varas *to the place of beginning.*"

There could not well be a more specific description of the corners and landmarks. There are four corners, consisting of certain trees, marked and carefully described, constituting the monuments as specifically described, as surveyors usually describe the monuments; and four straight lines for sides, forming very nearly a parallelogram; and such appears to be the shape of the land on the deseño. No other points or objects could be lawfully taken. Now the land included within these boundaries is the land confirmed, and no other. There was no further ground for litigation. All that was necessary to do was to find the monuments and run the connecting lines according to the description in the decree. Monuments of this kind may be destroyed, and it may become difficult to find them; but that is the misfortune of the parties interested. It does not appear that that was the case here. Monuments are often destroyed when planted by government surveyors in surveying the public lands, and this occasions much trouble in after years, as this court has had frequent occasion to know, from litigation before it, as to boundaries of the public surveys and the location of the monuments, officially, planted by the United States surveyors.

In this case the record of the juridical possession was referred to in, and made a part of, the petition for confirmation filed before the land commissioners, as describing the lands for which confirmation was asked. Thus the claim made upon the record was for these specific lands within the boundaries prescribed by the juridical possession, and adopted in the final decree, *and no other.* It does not appear in the record that any claim was made before the board or court for lands outside these boundaries, or that there ever was any contest over lands outside the prescribed boundaries. The juridical possession was a ceremony analogous to livery of seisin at common law, and it defines specifically the lands granted. This juridical possession is, of itself, controlling as to the lands granted. *Graham* v. *U. S.*, 4 Wall. 261, 262; *U. S.* v. *Pico*, 5 Wall. 539, 540. In this case we have not only the juridical possession, but the decree confirming the grant in accordance with it, and with the claim of the petitioners, as shown by the record; and this decree, whether right, or wrong, as we have seen, is final and conclusive. The case was not open, thereafter, to further contest, or claim for lands outside these boundaries. In my judgment, that claim for land outside ceased to be *sub judice*, if it ever was in that condition, at the date when this decree became final. After that no land outside of these prescribed boundaries could, lawfully, be included in the patent issued under the confirmation; and there was no longer any legitimate, or substantial, basis for any claim to such lands.

*Newhall* v. *Sanger*, 92 U. S. 761, and *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228, present cases entirely different from this. In the former, when the general map of the route was filed by the railroad company the claim for confirmation of the Moquelamos grant, within the exterior boundaries of which the lands in dispute were situated, was still pending and undetermined. The grant was afterwards rejected as

fraudulent.    The *claim itself to the grant* was, undoubtedly, *sub judice*, for it was still pending, and *the validity of the claim* undetermined by the courts. It was held that the grant being still *sub judice* the lands were not embraced· within the railroad grant.    The case was decided upon a partial record in which all the facts did not appear.    Afterwards, in *U. S.* v. *McLaughlin*, it appeared that the land claimed under the Mexican grant was for a certain number of leagues within exterior boundaries containing a great many more leagues,—a float; and it was held that, since there was ample land left to satisfy the grant, and the right of location was in the government, the surplus lands were subject to grant, and those within the purview of the railroad grant passed to the railroad company; and the court limited the rule as to lands *sub judice*, at the time of the railroad grant, to grants by name and grants by specific boundaries, in which *all the lands passed to the grantee.    U. S.* v. *McLaughlin*, 127 U. S. 428, 8 Sup. Ct. Rep. 1177.

So the case of *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228, did not present all the facts, and the court acted upon the hypothesis that the grant was one by name,—the "Rancho Las Pocitas" including all the lands within the indicated boundaries.    It was substantially so alleged in the *offer of proof* (see p. 621, 125 U. S., and page 1229, 8 Sup. Ct. Rep.,) and such is the idea conveyed by the proofs offered as stated on pages 622 and 623.    It does not appear in that record that the supreme court modified, as it did the decrees of the *board and of the district court*, and limited the confirmation to *two square leagues*, or that the exterior boundaries covered from ten to twelve square leagues,—that it was, therefore, in fact, a mere float; a grant of quantity, within boundaries containing nearly six times the quantity confirmed.    But all this appears in the subsequent, case, involving lands in the same grant "Las Pocitas," *U. S.* v. *Curtner*, 38 Fed. Rep. 1, and 14 Sawy. 535, the decision in which was concurred in by both the circuit justice and circuit judge,—the former, with Justice STRONG, having originally dissented in *Newhall* v. *Sanger.*    The court in *Newhall* v. *Sanger* doubtless supposed that the grant called "Moquelamos" was a grant by name, with definite boundaries.    This clearly appears from what is said in *U. S.* v. *McLaughlin*, 127 U. S. 455, 456, 8 Sup. Ct. Rep. 1177.    Said the court among other things: "There is really nothing in the decision of *Newhall* v. *Sanger*, in conflict with the views here expressed, *because the court did not have before it the case of a floating grant*," page 456, 127 U. S., and page 1191, 8 Sup. Ct. Rep.    And in that case, the *validity of the grant itself* had not been decided when the railroad grant was alleged to have attached.    And in *Doolan* v. *Carr* the court supposed that "Las Pocitas" was a grant by name, including all land within the boundaries given, and acting upon this idea, as seems evident from what it said in 125 U. S. 631, and 632, 8 Sup. Ct. Rep. 1234 and 1235, and in the third head-note, pages 618, 619, it considered, and perhaps, properly, too, the case to be still *sub judice* under its *loose and extremely vague general boundaries as described, until they should be properly and specifically determined.*    The boundaries in both these cases were general, loose and vague to the last degree, and

much latitude in the exercise of discretion by the surveyor, must, necessarily, have been exercised.    In those cases, until the survey had been made and approved, and the land granted located, the case was, perhaps, *sub judice*.    The San José grant, now under consideration, *presents no such case*.    It had been awarded to the claimants as long ago as 1857, by a final decree, which not only confirmed the grant, but pointed out the boundaries by specific corners, carefully described, and courses connecting them, *which no surveyor could lawfully disregard, change or modify;* and I find nothing in the cases cited to warrant me in saying, that, after that specific decree became final, either the grant or its boundaries were in any just or legal sense, or in the sense as used in the cases cited, *sub judice*.    The grant was undoubtedly *sub judice*, from the filing of the petition till the entry of the final decree confirming and identifying the lands granted by specific metes, bounds and monuments, clearly described.

Prior to the entry of that decree confirming the grant, like that in question, the grant to the railroad company under the decisions in the cases cited, would not have taken effect, even if the grant were afterwards rejected as fraudulent, upon *lands confessedly within the specific boundaries* of the grant as described and claimed in the petition, it being a grant *covering all the lands within the boundaries*.    But these lands now under consideration never were within the boundaries described in the juridical possession, for which the petition was filed, and in the final decree, which follows literally the juridical possession.    Like much of the land *claimed* to be within the Moquelamos grant, these lands were entirely outside the *exterior* boundaries of the grant.    I doubt very much whether they ever were *sub judice*, although the lands described *in the grant* undoubtedly were.    They were miles outside the boundaries described in the juridical possession and decree, and could in no way be lawfully brought within the grant.    In *U. S.* v. *McLaughlin* the main question was, "Whether the land in question *was actually within the outside limits* of the pretended Moquelamos grant?"    127 U. S. 441, 8 Sup. Ct. Rep. 1183.    Had it not been, as a large part was found by the court not to be, *although so earnestly and vigorously claimed*, that ended the question.    Now, in this case, the lands under consideration never were within the outside limits of the grant, as indicated by the juridical possession, and that ought to end the matter.

But the supreme court itself, in the case of *U. S.* v. *McLaughlin*, the *very last* case on the subject, has decided the point, substantially, that the mere *claim* that lands are within the boundaries of a grant *does not make them sub judice* even in a float, within the meaning of that phrase, as used by the court in the three cases cited.    That decision *authoritatively* settles the point, and does not leave it open for further discussion.    Nearly all the lands involved in that suit lay east of the Jack Tone road, which followed the line between sections 7 and 8.    The complainants earnestly insisted that the eastern boundary of the Moquelamos grant was the Sierra Nevada range, 80 miles distant, and if not that range, then, that Bear mountain, 24 miles east of the Jack Tone road, was the

narrowest eastern limit of the grant. The most of the testimony in that case, both by complainants and respondents, was introduced upon this single point to show the eastern exterior boundary of the grant, the complainants insisting that it was the Sierra Nevada range, and if not, that, then, at least, Bear mountain, and the respondents, that it was the Jack Tone road. And the court opens the discussion on page 441, 127 U. S., and page 1183, 8 Sup. Ct. Rep., by saying that the first question is, *"Whether the land in question was actually within the outside limits of the pretended Moquelamos grant?"* Several pages are then devoted to discussing the evidence on this point, which was the great point of discussion in the case, and the court then concludes:

"On the whole, we are satisfied that the *outside boundary limits of the Moquelamos grant, as called for in the grant itself,* do not extend east of the Jack Tone road, or the edge of the hills commencing near the same. *This result would dispose of the present case with regard to nearly all the land, in question therein,"* pp. 447, 448, 127 U. S., and page 1186, 8 Sup. Ct. Rep.

Thus, as to the great body of lands in question, the court put the decision expressly on the ground, that although within the boundaries, *as claimed,* they were, *in fact, outside the real boundaries of the grant.*

Then, the *mere claim* that the lands were within the boundaries of the grant did not make them *sub judice,* within the meaning of that term, as used by the court; for this point is wholly outside and independent of the distinction between floats and grants by specific boundaries or names, on which distinction the few lands west of the Jack Tone road were still given by the court to the railroad company as not coming within the decision of *Newhall* v. *Sanger.* It seems to me that there is no evading this authoritative decision; that a *mere claim* that lands are within the exterior boundaries of a grant, when not so in fact, does not make them *sub judice even in the case of a float,* much less in a grant with specific bounds, finally and irrevocably confirmed and fixed by such specific bounds.

I am, therefore, clearly of the opinion that these lands now under consideration were not *sub judice* in the sense as the terms are used in the cases cited when the railroad grant attached, and that the grant is valid and passed a good title.

On this point I regret to find that I cannot agree with my associate. On all the other points discussed by my associate, in the opinion now delivered, I fully concur with his views.

It has been suggested that the ruling on demurrer as to indemnity lands adopted in the opinion of my associate in which I concur, and being the lands in question, is inconsistent with the ruling in *Railroad Co.* v. *Wiggs,* decided by me, and reported in 43 Fed. Rep. 333, and 14 Sawy. 568. When that case was decided the decision on demurrer in this case had not fallen under my notice. But the cases are not inconsistent and can well stand together. In that case the decision was not put upon the ground that the company's *title* attached to lieu lands at any time before the selection, but on the ground that under the special provision of that act they, as well as those within the primary grant,

were withdrawn from pre-emption, and other disposition before provided for by law, and that, although the company's *title did not vest*, till selection, still that, until it had an opportunity to select, nobody else could acquire or initiate a pre-emption or other right, under existing laws. And that the pre-emption claim then in question was initiated and afterwards proved up and the patent issued, while the lands were withdrawn and not subject to sale as the laws then stood, except to the company, and while awaiting an opportunity for the company to select, and were not then subject to such disposition. Congress had power, had it seen fit to do so, to withdraw any lands from pre-emption without reference to other grants, and without conferring any rights upon another to the lands. But that act did not purport or attempt, nor could it have done so if attempted, to limit the power of congress to make subsequent grants to such lands before any other right in them had vested; and the grant now in question was a subsequent one made by congress itself, and as no other right had yet attached to the lands, it was in no way affected by the provisions for withdrawal from pre-emption and sale by the prior act. I concur with the district judge wherein he held on demurrer as follows:

"To lands to which no title could attach prior to selection, I do not think the Atlantic & Pacific Company had, at the time of the grant to the Southern Pacific Company, a present, or prospective right. If it had such right to the particular lands in suit, it had the same right to all other lands to which the right of selection might have applied. And since, by the act making the grant, the Atlantic & Pacific Company was empowered to construct its road along the thirty-fifth parallel of latitude to the Colorado river 'at such point as may be selected by the company for crossing, thence by the most practicable and eligible route to the Pacific' ocean, the present and prospective right of that company, prior to selection, might be applied to any public land situated between the Colorado river and the Pacific ocean with equal propriety as to the particular lands in controversy here. The effect of such a holding would be to give the proviso as broad a scope as the granting clause to which it is appended."

The question whether the clause in the provision of section 23 in the act of 1871, "that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company, or any other railroad company," or any clause in the act of 1866, in view of all the facts of the case, defeats the grant to respondent as to those lands, which lie within the primary limits of the grant, does not arise in this case, and, therefore, need not be discussed. Yet, since there is an intimation, in the opinion of the district judge, upon the demurrer, although the question was not involved, and, consequently, there was but a partial consideration of the point, that such is the case, I refer to it now for the purpose, only, of saying that I do not wish to be considered as acquiescing in that view. I shall not at this time decide or discuss that question, but leave it for full discussion and decision when the point properly arises.

Under the views expressed, and those of my associate on the other points discussed by him, in which I have concurred, and under the pro-

visions of section 650 of the Revised Statutes of the United States, the bills, as to all the lands involved in the several cases before us, must be dismissed, and it is so ordered.